IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF JAYDI L.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF JAYDI L., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

YURI L., APPELLANT.

Filed May 1, 2018.    No. A-17-1070.

Appeal from the Separate Juvenile Court of Douglas County: DOUGLAS F. JOHNSON, Judge. Affirmed.

Beau G. Finley, of Finley & Kahler Law Firm, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, Anthony Hernandez, and Emily A. Peklo, Senior Certified Law Student, for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Yuri L. appeals from the decision of the separate juvenile court of Douglas County terminating her parental rights to her daughter, Jaydi L. We affirm.

BACKGROUND

*Procedural Background.*

Yuri and Stacey B. are the biological parents of Jaydi (born in 2009). Jaydi was removed from parental care and custody in September 2016, after she alleged that Stacey had subjected her to inappropriate sexual contact. She was placed in the custody of the Nebraska Department of Health and Human Services (DHHS), and into a kinship foster home where she has remained. A

- 1 -

motion for termination of Stacey's parental rights to Jaydi was filed in these juvenile proceedings, but he ultimately relinquished his parental rights to Jaydi at the beginning of the termination hearing. Because Stacey is not part of this appeal, he will only be discussed as necessary.

The State filed a petition on September 7, 2016, alleging that Jaydi was a child as defined by Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), because she lacked proper parental care by reason of the faults or habits of Yuri. The State alleged that Yuri knew or should have known that Stacey was subjecting Jaydi to inappropriate sexual contact; Yuri was suffering from a mental health condition and was unable to care for Jaydi; Yuri failed to provide proper parental care, support, and/or supervision to Jaydi; and therefore, Jaydi was at risk of harm.

Pursuant to an order filed on September 14, 2016, Yuri was granted reasonable rights of supervised visits with Jaydi. However, on September 28, the court granted an ex parte motion by Jaydi's guardian ad litem (GAL) to suspend Yuri's visits. The court also ordered Yuri to stay away from Jaydi's foster home and school. On October 12, the court entered an emergency restraining order against Yuri, stating she was to have no contact or communication with Jaydi pending further order of the court.

On October 24, 2016, the court granted the request of Yuri's counsel to appoint a GAL for Yuri due to her "mental health issues," and a GAL was appointed for her.

At the adjudication hearing on January 31, 2017, the State was allowed to amend the juvenile petition by interlineation so that the petition alleged that Jaydi was a child as defined by § 43-247(3)(a), because she lacked proper parental care by reason of no fault of Yuri. The petition remained otherwise unchanged. We note that Yuri was not present at the adjudication hearing, but was represented by counsel. The court found the allegations against Yuri in the amended petition were true by a preponderance of the evidence, and Jaydi was adjudicated to be within the meaning of § 43-247(3)(a) through no fault of Yuri. The foregoing is reflected in the court's order filed on February 1.

On May 15, 2017, the State filed a motion for termination of parental rights seeking to terminate Yuri's parental rights to Jaydi pursuant to Neb. Rev. Stat. § 43-292(1), (2), and (9) (Reissue 2016). The State alleged that: Yuri had abandoned Jaydi for 6 months or more immediately prior to the filing of the petition; Yuri substantially and continuously or repeatedly neglected and refused to give Jaydi necessary care and protection; Yuri had subjected Jaydi or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse; and termination of Yuri's parental rights was in Jaydi's best interests.

In a disposition order filed on June 6, 2017, the court stated the permanency objective was reunification with a concurrent plan of adoption, but the court found that "based on this evidence, the concurrent permanency objective of adoption to be most likely in this case." The court found that no further reasonable efforts were required to reunify the child with the parents "due to the nature of the adjudication in this matter as well as parents having made no therapeutic progress throughout the entirety of this case."

*Termination Hearing.*

A hearing was held on September 6, 2017, to determine whether Yuri's parental rights to Jaydi should be terminated. Yuri did not appear at the hearing, but was represented by counsel who was present at the hearing. A summary of the evidence follows.

Jaydi's foster mother testified Jaydi had been placed with her for 1 year. The foster mother lived in the same neighborhood where Yuri and Jaydi had lived. She was familiar with Jaydi prior to the placement, because Jaydi would come to the foster mother's house to play with her children; the foster mother never really had any interaction with Yuri. When Jaydi was initially placed in the foster home she "seemed kind of standoffish," and for the first 4 months she slept underneath her bed. Jaydi had nightmares and said she was scared that her father would come get her; Jaydi also said she was afraid of what her mother would do to her. After entering therapy and being reassured that she was in a "safe space," Jaydi "slowly stopped sleeping underneath her bed, [and] the whining stopped." At the time of the termination hearing, Jaydi was no longer having nightmares nor was she still sleeping under the bed. The foster mother described Jaydi as "super happy" and said she was "leaps and bounds different than when she first came" to live in the foster home. Jaydi completed therapy at the beginning of the year.

In the beginning, Yuri would stop by the foster home for various reasons. However, the last time Yuri came to the foster home was at the end of October 2016. When asked on cross-examination if she had any concerns about Yuri's mental health based on her interactions with Yuri, the foster mother responded, "At one point in time before -- the contact was lost, [Yuri] was digging in trash across the street from my house, and it concerned me, freaked me out a little bit." "There [were] a couple other instances of her roaming around the neighborhood . . . that were questionable, to say the least. Definitely not normal behavior in my opinion."

Machaela Hackendahl, a licensed mental health practitioner, testified she worked with Jaydi from October 2016 to mid-April 2017. Jaydi was diagnosed with post-traumatic stress disorder; she had disrupted sleep, was "very anxious," and was hypervigilant. During sessions, Jaydi talked about "the bad things" her father had done to her, but would never detail what those "bad things" were. Jaydi also talked about hiding behind a couch when her parents were fighting, and she "kind of [relived] how scared she was and how frightened she was, and [hiding] behind the couch with her dog offered her comfort." Hackendahl said Jaydi was able to successfully complete therapy "due to the attachment and stability that she received from her foster parents." When asked if it would have been beneficial for Yuri to be involved in Jaydi's therapy, Hackendahl responded, "If [Yuri] had completed treatment, participated in her own therapy, and I could have . . . collaborated with that therapist, it could have been beneficial to have mom do some of that repair work with Jaydi." On cross-examination, Hackendahl was asked if she was "ever made aware of any concerns" regarding Yuri's mental health. Hackendahl responded, "Not that I can recall at this time."

Joslyn Thomaier, a family permanency specialist supervisor with Nebraska Families Collaborative (NFC), was Jaydi's caseworker from September 2016 to April 1, 2017. During her time on the case, Thomaier had one face-to-face contact with Yuri, which occurred in September 2016; Thomaier provided her contact information to Yuri in September. Thomaier also had

"maybe" five telephone conversations with Yuri, mostly towards the end of 2016, beginning of 2017; the last telephone contact was "close to March of 2017." Thomaier was not able to go over court orders with Yuri because during every telephone conversation, Yuri "would be very angry and almost belligerent, so there wasn't, like, a period where we could have a conversation where I would be able to go over those court orders with her." If Yuri had not been angry and belligerent, Thomaier would have gone over the court orders with her and would have attempted to offer services to her. Those services would have included visitation, the opportunity to have a mental health evaluation and a chemical dependency evaluation, therapy, and family support. Other than a referral for visitation "at the very onset of this case," "there were no other referrals put into place" because NFC was "unable to have contact with [Yuri] on an ongoing basis to set up services."

In January 2017, Yuri told Thomaier that she had left Nebraska to go live with her mother in South Dakota. Thomaier said "there were no services that we could provide out there," but "I encouraged her to get services, primarily mental health treatment." Thomaier tried to reach out to Yuri's mother by telephone. She also sent certified letters to Yuri's mother every month to try and get in contact with Yuri and to enlist the mother's help. Thomaier had no actual contact with Yuri's mother until the mother contacted her in April. Because Thomaier was no longer on the case at that time, she gave Yuri's mother the contact information for the new caseworker.

On cross-examination Thomaier acknowledged that she was concerned about Yuri's mental health, because in November or December 2016 Yuri said she was diagnosed as paranoid schizophrenic; at the time, Yuri was on a "Board of Mental Health hold at Immanuel hospital." Yuri had been released before Thomaier could visit her, and during their next contact Yuri would not tell Thomaier where she was and refused to meet with her; Yuri also refused to sign a release of information. When Thomaier spoke to Yuri's mother in April 2017, Thomaier asked about Yuri's diagnosis, but Yuri's mother did not confirm a diagnosis. The mother did say that Yuri was not seeking any treatment.

Thomaier acknowledged that since October 12, 2016, Yuri was not allowed to have contact with Jaydi pursuant to a court order. Thomaier tried to talk to Yuri to explain why there was no contact with Jaydi, and encouraged Yuri to contact her attorney and GAL, but Thomaier said "it was literally me trying to talk over someone screaming." She also acknowledged that Yuri attempted to contact the foster home and Jaydi's school at various times. She further acknowledged that Yuri contacted NFC at different times, including around January 2017, trying to get information on Jaydi. Thomaier did not believe there was anything more she could have done to assist Yuri that she had not already tried.

Madison Hayward, a NFC family permanency specialist, became Jaydi's caseworker on April 1, 2017, and was still the assigned caseworker at the time of the termination hearing. Hayward testified she is required to attempt contact with parents three times each month, and that she did make the requisite attempts to speak with Yuri. Hayward also sent "several" certified letters to Yuri at her mother's home in South Dakota, and "[a]ll of them came back signed." Hayward and Yuri did not have any face-to-face contact, but three telephone conversations did occur (June, July, and September).

During the telephone conversations, Hayward attempted to go over the outstanding court orders with Yuri, but was not successful. All three conversations were regarding Yuri's

participation in services in South Dakota. In June, Yuri reported that she was staying at the Human Services Center in Yankton, South Dakota, and that she was participating in group classes as well as receiving medication. When Hayward asked Yuri if the Human Services Center was a "treatment facility," Yuri was unclear in her answer, but Hayward "gathered . . . it was . . . more of a respite facility that also offered group classes, I would assume psychological visits, as she was receiving medication from there"; Hayward did not know what the group classes addressed. Yuri did not provide Hayward any documentation from or about the Human Services Center. In July, Yuri reported she was still living at the Center, still receiving medication, and still attending group classes. She also reported that in her spare time she walked and listened to music. Again, no documentation was provided to Hayward. In September, Yuri reported that she was living with her mother. When Hayward asked if she was still taking her medications, Yuri said that she was. Hayward testified that during all three telephone conversations, Yuri said she planned to come to Omaha, Nebraska, but at each subsequent conversation no plans had been made.

Hayward said that Yuri did not attend any of the family team meetings. Although Yuri asked Hayward how Jaydi was doing, Yuri never asked to parent Jaydi or for visits. Had Yuri been available and willing, Hayward would have made referrals for family support work, a psychiatric evaluation, ongoing therapy, and supervised visitation. When asked if she was able to make any of those referrals in South Dakota, Hayward said, "Not that I'm aware of."

During cross-examination, Hayward was asked if she was made aware of any mental health diagnosis for Yuri. Hayward's understanding from Thomaier was that Yuri had been diagnosed with paranoid schizophrenia. Based on Hayward's review of the case file, Yuri had never provided any type of medical or mental health evaluation. Yuri reported to Hayward that while she was at the Human Services Center, they had recommended she "be admitted to mental health rehab." Hayward said Yuri "seemed to know how to do that, from the services that she was getting at the Human Resources Center."

In Hayward's opinion, it was in Jaydi's best interests to "maintain permanency with [the foster parents]" and to be adopted by them. Hayward testified that "based on my conversations with [Yuri], and her history, I do not think that [Yuri] has proven the ability to care for her child permanently." Hayward agreed that in order for Jaydi to be adopted, Yuri's parental rights would need to be terminated. When asked if she believed that process to be in Jaydi's best interests, Hayward said, "Yes."

*Juvenile Court's Decision.*

In an order filed on September 12, 2017, the juvenile court found, by clear and convincing evidence, that grounds existed to terminate Yuri's parental rights to Jaydi pursuant to § 43-292(1), (2), and (9). The juvenile court further found that termination was in Jaydi's best interests, and Yuri's parental rights were terminated. Yuri has timely appealed the juvenile court's order.

ASSIGNMENTS OF ERROR

Yuri assigns, restated, that the juvenile court erred in finding that (1) statutory grounds exist to terminate her parental rights and (2) termination of her parental rights was in Jaydi's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

ANALYSIS

*Statutory Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Yuri's parental rights to Jaydi, the juvenile court found that statutory grounds existed pursuant to § 43-292(1) (abandonment), § 43-292(2) (substantial and continuous or repeated neglect), and § 43-292(9) (aggravated circumstances).

Section 43-292(2) generally provides for termination of parental rights when the parent has neglected and refused to give the necessary care to the juvenile or a sibling of the juvenile. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010). One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2). *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). "A parent may as surely neglect a child of whom she does not have possession by failing to put herself in a position to acquire possession as by not properly caring for a child of whom she does have possession." *In re Interest of J.N.V.*, 224 Neb. 108, 112, 395 N.W.2d 758, 761 (1986).

Yuri last saw Jaydi in September 2016, at which point her visits were suspended by the court and an emergency restraining order was ultimately entered. Thomaier had one face-to-face contact with Yuri in September, at which point Thomaier provided her contact information to Yuri. Thomaier subsequently made numerous attempts to contact Yuri, most of which were unsuccessful. During the "maybe" five telephone conversations she had with Yuri, mostly towards the end of 2016, beginning of 2017, Thomaier was not able to go over court orders with Yuri because during every telephone conversation, Yuri "would be very angry and almost belligerent, so there wasn't, like, a period where we could have a conversation where I would be able to go over those court orders with her." Thomaier tried to talk to Yuri to explain why there was no contact with Jaydi, and encouraged Yuri to contact her attorney and GAL, but Thomaier said "it was literally me trying to talk over someone screaming." Other than a referral for visitation "at the very onset of this case," "there were no other referrals put into place" because NFC was "unable to have contact with [Yuri] on an ongoing basis to set up services."

In January 2017, Thomaier learned that Yuri had moved to South Dakota. Hayward was only able to have three conversations with Yuri from June to September. During the telephone conversations, Hayward attempted to go over the outstanding court orders with Yuri, but was not successful; Hayward did not elaborate. Yuri claimed to be participating in services (on her own) in South Dakota, but never provided documentation about those services. When asked if she was able to make any referrals in South Dakota, Hayward said, "Not that I'm aware of." During all

three telephone conversations, Yuri said she planned to come to Omaha, but at each subsequent conversation no plans had been made. Yuri did not attend any of the family team meetings. And although Yuri asked Hayward how Jaydi was doing, Yuri never asked to parent Jaydi or for visits.

We note that Yuri asserts that her actions were not intentional due to "her diagnosis of Paranoid Schizophrenia." Brief for appellant at 13. However, as noted by the State, the only diagnosis appearing in our record is the one self-reported by Yuri. Yuri refused to sign medical releases for Thomaier, and she did not provide any other documentation of her diagnosis. In her brief, Yuri argues the State "ignores the fact that the Court had already found that [Yuri] suffered from a mental illness on February 1, 2017." *Id*. at 20. However, Yuri's claim is inaccurate as the court's February 1 order of adjudication simply found that the allegations against Yuri in the petition were true; the petition alleged in part that she was "suffering from a mental health condition." Additionally, Yuri suggests the State should have sought to terminate under § 43-292(5) (unable to discharge parental responsibilities because of mental illness or mental deficiency). However, even when there is evidence of mental illness, the State is not required to proceed under § 43-292(5). See *In re Interest of J.N.V., supra* (mother diagnosed as paranoid schizophrenic; State sought and obtained termination of her parental rights solely on the basis of neglect under § 43-292(2); Supreme Court held State not required to proceed under § 43-292(5)). See, also, *In re Interest of Michael B. et al.*, 258 Neb. 545, 604 N.W.2d 405 (2000) (improper for State to adduce evidence of mother's mental deficiency where it had not asserted § 43-292(5) as ground for termination; but judgment affirmed upon finding there was clear and convincing evidence independent of any mental deficiency that grounds for termination existed under § 43-292(4)). In the instant case, the State did not seek to terminate Yuri's parental rights under § 43-292(5), nor was it required to do so. Furthermore, it was Yuri's counsel, not the State, who continually questioned witnesses about Yuri's mental health.

To summarize, Yuri did not maintain consistent contact with NFC, thus NFC was unable to make referrals. When Thomaier did contact Yuri, Yuri was angry, belligerent, and screaming, making the contact unproductive. Yuri moved to South Dakota where NFC could not provide her referrals for services. Yuri reportedly participated in some services in South Dakota, but provided no documentation regarding such services. She repeatedly claimed she was coming back to Omaha, but never did. And she never requested visits with Jaydi. By her own actions and choices, Yuri failed to put herself in a position to acquire possession of Jaydi. See *In re Interest of J.N.V., supra*. Our de novo review of the record clearly and convincingly shows that grounds for termination of Yuri's parental rights under § 43-292(2) were proven by sufficient evidence.

We need not consider whether termination of Yuri's parental rights was proper pursuant to § 43-292(1) and (9) since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the children. See *In re Interest of Elizabeth S., supra*.

*Best Interests.*

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to

raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nicole M., supra.* Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

As stated previously, Yuri's last contact with Jaydi was in September 2016. Throughout this case, Yuri has failed to maintain consistent contact with NFC. Other than a referral for visitation "at the very onset of this case," "there were no other referrals put into place" because NFC was "unable to have contact with [Yuri] on an ongoing basis to set up services." Thomaier was unable to have a productive conversation with Yuri because Yuri was angry, belligerent, and screaming. Hayward could not provide referrals for services because Yuri had moved to South Dakota. And Yuri provided no documentation of services she reportedly participated in there.

Jaydi was diagnosed with post-traumatic stress disorder; she had disrupted sleep, was "very anxious," and was hypervigilant. She had nightmares in part because she was afraid of what Yuri would do to her. She made significant progress in therapy and her behaviors resolved. Hayward testified that it would be in Jaydi's best interests to terminate Yuri's parental rights.

At the time of the hearing, Jaydi had been in an out-of-home placement for 12 months. During the pendency of this case, Yuri made no progress. As noted by the juvenile court, "[Yuri] has shown no interest whatsoever in parenting her child." She never asked to parent her child or even to visit her child. And we note that she did not appear at either the adjudication or termination hearings. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra.* We find that the State has rebutted the presumption of parental fitness as to Yuri. We further find that there is clear and convincing evidence that it is in Jaydi's best interests to terminate Yuri's parental rights.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Yuri's parental rights to Jaydi.

AFFIRMED.